**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DANIELLE LEE McCLOSKEY,   )
            )
            )
    Plaintiff,    )
            ) Civil Action No. 12-1555
   vs.      ) Judge Nora Barry Fischer
            )
CAROLYN W. COLVIN,    )
Acting Commissioner of Social Security )
            )
    Defendant,   )

**MEMORANDUM OPINION**

## I. INTRODUCTION

Danielle Lee McCloskey ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 – 1383f ("SSA"). This matter comes before the court on cross motions for summary judgment. (Docket Nos. 8, 10). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

## II. PROCEDURAL HISTORY

On April 15, 2009, Plaintiff applied for SSI, asserting disability beginning March 1, 2000. (R. at 13).[1] Plaintiff alleged that she suffered from endometriosis, attention deficit disorder, depression, bipolar disorder and headaches. (R. at 56). This claim was denied on September 10, 2009. (*Id*.). Plaintiff appeared and testified at a hearing held on October 28, 2010,

---

[1] Citations to the Record, *hereinafter*, "R. at __".

where an impartial vocational expert also appeared and testified. (R. at 13). On February 23, 2011, the Administrative Law Judge ("ALJ") determined Plaintiff had not been under disability within the meaning of the SSA. (R. at 10). Plaintiff then filed a request with the Appeals Council, which was denied on September 24, 2012, thereby making the judgment of the ALJ the final decision of the Commissioner. (R. at 1).

A complaint was filed in this Court by the Plaintiff on October 29, 2012, seeking review of the Commissioner's decision to deny Plaintiff's previous claim. (Docket No. 3). Defendant filed her answer January 3, 2013. (Docket No. 5). Plaintiff then filed a Motion for Summary Judgment on January 31, 2013, (Docket No. 8), followed by Defendant's Motion for Summary Judgment on February 21, 2013. (Docket No. 10).

## III. STATEMENT OF FACTS

### A. *Plaintiff's General Background*

Plaintiff is a single mother who was born on February 5, 1970, making her forty at the time of her administrative hearing.[2] (R. at 142). She lives with her daughter, born in 1996 and son, born in 2004. (R. at 125). Her parents separated when she was five; consequently, she was primarily raised by her mother until she moved out at the age of fourteen.[3] (R. at 345). She completed the tenth grade, but did not graduate high school and she never received her GED. (R. at 150). Plaintiff is currently unemployed and has not worked since 2001. (R. at 138). She held numerous jobs from 1987 until 2001, (R. at 138-139), but she was no longer able to work because her pelvic pains were too much for her to handle, especially when the headaches became worse. (R. at 146). Now, she receives financial support from her children's father, through a

---

[2] Plaintiff is a "Younger Person" Pursuant to 20 C.F.R. §§ 404.1563, 416.963.
[3] Plaintiff comes from a family with a history of substance abuse and mental illness. Her mother is recovering from drug and alcohol problems and her father is also a recovering alcoholic. (R. at 252). Two of her sisters and one brother have also been involved with drugs and alcohol. (*Id.*). Her maternal grandfather and paternal grandmother were also alcoholics, (R. at 252), and she has a maternal uncle who has been reportedly in and out of a psychiatric hospital (R. at 253).

Family Grant and via food stamps. (R. at 126). She does not have a driver's license, so when she needs to leave the house, she takes the bus or gets a ride with either her sister or mother. (R. at 162). Plaintiff has two DUI convictions.[4] (R. at 252). She also smokes a pack of cigarettes a day. (R. at 227).

During an average day, Plaintiff wakes up early to get her children prepared for school. (R. at 160). She takes care of her dog as well. (R. at 160). She prepares all three meals for her children. (R. at 161). While they are at school, she does house work – cleaning, laundry, vacuuming, etc. – but at a slow pace because of her pain. (R. at 160). She may watch TV during the day. (R. at 163). Due to her discomfort, Plaintiff cannot take a shower and must take baths instead. (R. at 160). Whenever the pain intensifies, she will lay or sit down for as long a period as needed. (R. at 159). She occasionally leaves her house but does not spend much time with anyone besides her family. (R. at 163). She does not walk many places other than to the bus stop, but when she does, she can only walk a few steps before she grows tired and needs to take approximately fifteen minutes to rest. (R. at 164).

B.    *Plaintiff's Medical History*

Plaintiff first sought psychiatric help from Dr. Mahendra Patil on November 19, 2003. (R. at 251). At that time, she had been living with her common-law husband and father of her children. (R. at 251). There had been constant conflict with her husband, with it sometimes becoming physical. (R. at 252). When she began treatment, she was suffering from poor self-esteem and was feeling "worthless, hopeless and helpless." (R. at 251). She was having difficulties sleeping and concentrating. (R. at 251). She complained that when she was around people, she would have panic attacks that would result in difficulty breathing, chest pressure and fear. (R. at 251). Dr. Patil diagnosed Plaintiff with major depressive disorder, moderate and

---

[4] The record does not indicate whether this is the reason that Plaintiff does not have a driver's license.

recurrent, with General Anxiety Disorder and assigned a GAF between 50-60.[5] (R. at 253). After giving birth to her son, an assessment was performed on June 8, 2004 as part of a crisis intervention because Plaintiff was increasingly depressed and had been off her medication for nine months due to her pregnancy. (R. at 246). Throughout her sessions, Plaintiff was unemployed, and financially relied on food stamps and her parents for support. (R. at 228, 235-252). Plaintiff was always appropriately dressed and groomed. (R. at 228, 235-252). She had normal psychomotor activity, volume and tone with intact judgment. (R. at 228, 235-252). She also always denied suicidal or homicidal ideations or abnormal perceptions and delusions. (R. at 228, 235-252). Dr. Patil frequently noted that Plaintiff was not taking her medications as prescribed. (R. at 235, 237, 239). Plaintiff last visited Dr. Patil on March 27, 2006, and received a second consecutive GAF of 60-65. (R. at 235). She then voluntarily terminated her treatment on June 19, 2007, without achieving Dr. Patil's goals of alleviating her depression and sleeplessness and she was assigned a final GAF of 50. (R. at 228).

In January of 2005, shortly after Plaintiff had a cholecystectomy[6], (R. at 194), she visited the Alle-Kiski Medical Center Allegheny Valley Hospital Emergency Department for her ongoing abdominal pain. (R. at 185, 192, 196, 201). She was first admitted on January 12, 2005 for surgical evaluation and observation, but left early against medical advice. (R. at 185-186).

---

[5]  The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed.2000). An individual with a GAF score of 41-50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id*. By comparison, "[a] GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id*.
[6]  Cholecystectomy is the removal of the gall bladder. *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0004618/(last viewed on Mar. 18, 2013).

She returned on January 14, 2005 and several CAT scans were performed with no etiology[7] being found and no clinical findings supported any reasons for her abdominal pain. (R. at 192, 194). The physician initially suspected that she was merely a narcotics seeker. (R. at 194). She was offered psychiatric help, but refused it. (R. at 192). Shortly thereafter, she was admitted for evaluation from January 16 until January 21 and underwent colonoscopies due to nausea, vomiting and bloody emesis.[8] (R. at 201). It was determined that she was suffering from inflammatory bowel disease, erosive gastritis[9] and clostridium difficile enteritis.[10] (R. at 201). She was discharged without further complications on medication. (R. at 202)

Since April of 2005, Plaintiff has visited Dr. Scheler, her primary care physician. (R. at 275-95). His records reflect that he treated Plaintiff for anxiety, depression, endometriosis[11] and hepatitis C.[12] Dr. Scheler has also prescribed Plaintiff with Ibuprofen, Vicodin, Ativan[13] and Bentyl.[14] (R. at 261). It is noted that on August 27, 2005, Plaintiff suffered an injury while riding on a quad, specifically, a deviated nose and neck pain.[15] (R. at 315).

---

[7] Etiology describes the cause of a disease. *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0003010/ (last viewed on Mar. 18, 2013).

[8] Bloody emesis is vomiting which contains blood. http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0003604/(last viewed on Mar. 18, 2013).

[9] Erosive gastritis is a condition of the stomach lining which often does not cause significant inflammation but can wear away the stomach lining. Erosive gastritis can cause bleeding, erosions, or ulcers. *available at* http://digestive.niddk.nih.gov/ddiseases/pubs/gastritis/(last viewed on Mar. 18, 2013).

10 Clostridium difficile enteritis is an early postoperative complication in inflammatory bowel disease patients after colectomy. *available at* http://www.ncbi.nlm.nih.gov/pubmed/17390162/(last viewed on Mar. 18, 2013).

[11] "Endometriosis is a female health disorder that occurs when cells from the lining of the womb (uterus) grow in other areas of the body. This can lead to pain, irregular bleeding, and problems getting pregnant." *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001913/(last viewed on Mar. 18, 2013).

[12] "Hepatitis C is a viral disease that leads to swelling (inflammation) of the liver." *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001329/(last viewed on Mar. 18, 2013).

[13] Altivan is a brand name for a lorazepam, which is used to treat anxiety. *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0001078/(last viewed on Mar. 18, 2013).

[14] Bentyl is a brand name for Dicyclomine, which is used to treat irritable bowel syndrome, or spastic colon and colitis. *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009928/?report=details(last viewed on Mar. 18, 2013).

[15] The Court recognizes that this quad riding injury was sustained during the time period in which Plaintiff had asserted her disability (March 1, 2000 – present).

On May 12, 2005, Plaintiff visited Dr. Douglas S. Skura, a Board Certified Orthopaedic Surgeon, about her back pain. (R. at 226). Dr. Skura recommended that she have an MRI of her lumbar spine. (R. at 227). After learning that she had been smoking a pack of cigarettes a day, he also recommended that she stop because it could be a cause of her chronic back pain. (R. at 227).

Dr. Scheler declined to perform an additional examination of Plaintiff's ability to perform work-related physical activities on June 17, 2009. (R. at 339). Plaintiff was then to have a Clinical Psychological Disability Evaluation performed by Peterson-Handley Associates on July 23, 2009, but she did not show up for the scheduled appointment. (R. at 342). Instead, on August 28, 2009, Dr. Charles Kennedy conducted a psychological evaluation of Plaintiff based upon a referral from the Bureau of Disability Determination to examine Plaintiff's complaints of endometriosis, ADD, depression, bipolar disorder, and headaches. (R. at 344). At the evaluation, Plaintiff demonstrated adequate hygiene and appearance, was well mannered, had good self-sufficiency and ambulated with no disturbance in gait. (R. at 344). Plaintiff complained that her depression and anxiety had been worsening over the past ten years, as she was increasingly irritable and was experiencing panic and tearfulness. (R. at 345). She was thus diagnosed with major depressive disorder, moderate without psychotic features and social phobia. (R. at 348).

Dr. Kennedy found that Plaintiff exhibited an appropriate affect with full range of expression, adequate intelligence, good abstract thinking and appropriate thought content to the situation. (R. at 347). Based on her mental status, he found that although she complained of poor concentration, she did very well during the evaluation and maintained her attention. (R. at 347). Her memory also did not appear weak. (R. at 347). A GAF score of 50 resulted. (R. at 348). Dr. Kennedy recommended that her prognosis would improve if she was evaluated by a psychiatrist for medication management and outpatient counseling. (R. at 348). He noted that Plaintiff had

only slight restrictions in making judgments on simple work-related decisions, understanding and remembering short, simple instructions as well as carrying them out. (R. at 351). Plaintiff had moderate difficulties in understanding, remembering and then carrying out detailed instructions. (R. at 351). She had moderate restrictions in interacting with the public, supervisors and co-workers. (R. at 351). Additionally, Plaintiff was moderately restricted in responding appropriately to work pressures in a usual work setting or to changes in a routine work setting. (R. at 351).

A Physical Residual Functional Capacity Assessment was performed on September 8, 2009, by Dr. Paul Fox. (R. at 355). He concluded that Plaintiff had the capability to occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds. (R. at 356). Plaintiff was capable of standing and/or walking (with normal breaks) for about six hours as well as sitting for about six hours during a normal workday. (R. at 356). Plaintiff was able to occasionally climb ladders and stairs, use ramps, kneel and craw. (R. at 357). Dr. Fox noted that even though Plaintiff had been diagnosed, she never sought or received specific treatment for her erosive gastritis or inflammatory bowel disease. (R. at 360). Based upon the evidence of record, Dr. Fox found that Plaintiff was only partially credible. (R. at 361).

On September 9, 2009, Dr. Richard A. Heil performed a Mental Residual Capacity Assessment on Plaintiff (R. at 362). Dr. Heil found that Plaintiff was not significantly limited in most mental activities, and only moderately limited in the following abilities: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule; maintaining regular attendance, and being punctual within customary tolerances; interacting appropriately with the general public; accepting instructions and respond appropriately to criticism from supervisors;

completing a normal workday and workweek without interruptions form psychologically based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods. (R. at 362-63). The medical evidence relied upon by Dr. Heil established that Plaintiff suffered from the determinable impairments of Major Depressive Disorder, Social Phobia and ETOH[16] Abuse. (R. at 364). Dr. Heil gave great weight to Dr. Kennedy's report, especially his statements concerning Plaintiff's ability to make occupational adjustments, performance adjustments and personal and social adjustments. (R. at 364). Dr. Heil thus determined that Plaintiff was able to meet the basic demands of competitive work on a sustained basis despite the limitations resulting from her impairments. (R. at 364).

Dr. Heil also performed a Psychiatric Review Technique on September 9, 2009. Plaintiff's determinable impairments included Major Depressive Disorder, (R. at 369), and Anxiety Related Disorder. (R. at 371). When examining Plaintiff's functional limitations, Dr. Heil found that she had moderate limitations in maintaining social functioning, concentration, persistence or pace, a mild restriction of activities of daily living and no repeated episodes of decompensation, each of which for an extended duration. (R. at 376). It was also Dr. Heil's opinion that Dr. Kennedy's assigned GAF score of 50 for Plaintiff was "somewhat overestimated in severity." (R. at 378).

On September 22, 2009, Dr. Scheler concluded that Plaintiff was disabled due to her endometriosis, attention deficit disorder, depression and hepatitis C. (R. at 381). He did not, however, include on the form he completed an explanation as to how each diagnosis affects her ability to work. (R. at 382).

---

[16] "Abbreviation for ethyl alcohol." STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

Most recently, on June 21, 2010 Plaintiff was admitted to UPMC St. Margaret with pleural effusion,[17] pneumonia, chronic obstructive pulmonary disease,[18] migraines and tobacco use disorder. (R. at 384). Following four days of treatment and tests, Plaintiff was discharged with "no physical restrictions" and was again told to quit smoking. (R. at 385). At Plaintiff's checkup on September 8, 2010, a CT scan reviled baseline emphysema, resolved pneumonia, resolved pleural effusion, minimal residual pleural thickening and interval regression of intrathoracic lymph nodes. (R. at 405).

C.    *Administrative Hearing*

At the hearing held on October 28, 2010, Plaintiff's primary contention for disability centered upon her physical health, and she testified to the following information. She claims that her severe physical pain is predominantly pelvic pain caused by her endometriosis. (R. at 33). There had been a mass in her lung, but it ended up being pneumonia. (R. at 33). A CT scan revealed that her lungs are still filling up with liquid, but doctors are not sure why. (R. at 44). While determining the cause of this fluid, her physician is withholding treatment for her hepatitis C. (R. at 44-45). She also suffers from migraine headaches and depression, causing her to go on crying spells. (R. at 33). Plaintiff must go to the hospital every six months in order to have the endometriosis examined. (R. at 33). Sometimes, Doctors have to perform a LEEP[19] in order to scrape away buildup of scar tissue. (R. at 33). She last had a LEEP performed about five or six years prior to the hearing. (R. at 36).

---

[17] "A pleural effusion is a buildup of fluid between the layers of tissue that line the lungs and chest cavity." *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001150/(last viewed on Mar. 18, 2013).

[18] Chronic obstructive pulmonary disease is a common lung disease making it difficult to breathe. One of the main forms is emphysema. *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001153/(last viewed on Mar. 18, 2013).

[19] A loop electrosurgical excision procedure ("LEEP") is a procedure using an electric current running through a loop of wire which removes tissue. *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004750/(last viewed on Mar. 18, 2013).

Plaintiff endures frequent pelvic pains, with some days being greater than others. (R. at 35). On most days, she experiences this pain about seven to ten times; but on other days, the pain will not be as frequent. (R. at 35). These recurrent episodes of pain can last anywhere from 10 to 45 minutes, at which point they become incapacitating and she must stop whatever she is doing. (R. at 41-42). Sometimes, Plaintiff begins to bleed, and she will be in the bathroom for about an hour. (R. at 42). This occurs almost every day of the week. (R. at 42). She most frequently experiences pain in the right side of her stomach and in the right side of her lungs, which causes her to feel like her airways are blocked when she breathes. (R. at 34). The migraines, which occur five to seven days a week, also cause pain that lasts about an hour and a half, causing her to "see circles and lines" and "get real dizzy." (R. at 42-43).

When Plaintiff sits up, it is harder for her to breathe; however, lying down causes even more pain. (R. at 38). She is unable to sit for more than a half an hour at a time. (R. at 38). She cannot stand for more than fifteen minutes and cannot walk any distance without being winded. (R. at 38). She does get much sleep either. She also complains about a constant migraine headache. (R. at 38). Plaintiff has problems stooping, bending forward, crouching, kneeling, squatting and climbing. (R. at 39). She also claims that her hands constantly shake and she has trouble lifting a gallon of milk. (R. at 38-39). As a result of her problems, she only gets about two to three hours of sleep every night. (R. at 39).

Plaintiff's typical day begins when she wakes up at 5:00 a.m. to prepare her children for school. (R. at 46). She says that she pretends everything is fine because she does not want them to know about her pain. (R. at 46). Once they leave for school, she will just lie back down for a few hours, usually without falling back asleep, before beginning work around the house. (R. at 46). She takes her time doing chores because after about 5 minutes, she needs a 15-30 minute

break. (R. at 43). On some days, she may leave the house in order to go shopping with her mother and sister because she does not have a car and does not like being by herself in public. (R. at 40, 43). She claims she is unable to concentrate long enough to even make it through a book or a TV show. (R. at 45). She occasionally cries throughout the day while waiting for her children to get home from school. (R. at 45-46). Her daughter will come home, but then the father's mother usually will drive her to one of her friend's house. (R. at 46). When her son gets home, she will help him with his homework. (R. at 46). He then leaves and goes with his father on most days that his father is not working out of town. (R. at 46). Plaintiff's daughter or mother may help out with the dishes and the laundry. (R. at 44). She does not attend most of her children's activities. (R. at 40).

Plaintiff also feels depressed and suffers from anxiety, yet she does not currently see a psychiatrist. (R. at 37). She had been seeing Dr. Patel, but stopped because it became difficult to get a babysitter and she does not drive. (R. at 37). She says that she felt more comfortable talking to her primary care physician, even though he told her that speaking with a counselor or therapist would help. (R. at 37). She has been prescribed Vicodin for approximately the past six years. (R. at 34). She used to take four a day, but now only takes two because she fears becoming addicted. (R. at 34). She also takes Ativan three times a day for her depression and Ibuprofen for her migraines. (R. at 34). She had been prescribed Fioricet[20]and Trazodone,[21] but each has been ineffective and caused her to vomit. (R. at 34-35).

Following Plaintiff's testimony, the Vocational Expert was examined by the ALJ to determine the jobs which may possibly be available in the current economy to the hypothetical

---

[20] Fioricet is a brand name of butalbital, acetaminophen, caffeine and codeine combination that is used for pain relief and as a relaxant used to treat tension headaches. *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009377/(last viewed on Mar. 18, 2013).
[21] Trazodone is an antidepressant medication. *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0003174/(last viewed on Mar. 18, 2013).

person of Plaintiff's age, education and lack of relevant work experience. (R. at 48). Further relevant factors considered by the expert included the ability to do light exertional work, except that the individual could occasionally climb ladders and would not be able to climb ropes or scaffolds. (*Id.*). The hypothetical individual could frequently climb ramps and stairs, balance, stoop and crouch while occasionally kneeling and crawling. (*Id.*). Additionally, the hypothetical person was limited to simple, routine, repetitive involving simple, work related decisions. (*Id.*). The individual could tolerate infrequent changes in her work setting but could not be able to work in a fast paced production environment. (*Id.*). Said hypothetical person could tolerate interaction with the public, co-workers and supervisors. (*Id.*). The person cannot be exposed to fumes, odors, gases, dust, chemicals, extreme heat, cold, humidity or wetness. (*Id.*). To this inquiry, the vocational expert replied that such a person would best be suited as a bagger, a racker such as in a bakery setting and a small parts assembler. (R. at 48-49).

The ALJ then used the same hypothetical question, but limited the hypothetical individual to demands of sedentary exertion with only occasional climbing of ramps and stairs, stooping, balancing and crouching. (R. at 49). In response, the Expert suggested the hypothetical person could be a table worker, an addressor or mail sorter or an electric or electronic assembler, such as with semiconductors. (R. at 49). If the second hypothetical person required two extra unscheduled fifteen minute breaks or was absent from the workplace three times or more on a consistent basis, however, she would be unsuitable for work in the unskilled labor market. (R. at 50-51).

## IV.    STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[22], 1383(c)(3)[23]; *Schaudeck v.*

---

[22] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action … brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business.

42 U.S.C. §§ 405(g).

[23] Section 1383(c)(3) provides in pertinent part:

*Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002).

"Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp*., 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 90-91 (3d. Cir. 1986).

---

The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

## V.    DISCUSSION

The ALJ determined that Plaintiff has not been under a disability since April 15, 2009, the date which Plaintiff filed her disability claim.[24] (R. at 23). The ALJ concluded that Plaintiff satisfied the first step of the analysis because she has not engaged in gainful activity during the time of her disability determination. 20 C.F.R. § 404.1571, *et seq*.; (R. at 15). Next, the ALJ found that the Plaintiff's emphysema; resolved right pleural effusion; probable post imflammatory scarring of the right lung; erosive gastritis; hepatitis C; endometriosis; headaches; depression; anxiety; and ADHD are severe impairments that satisfy the second step of Plaintiff's analysis. 20 CFR § 416.920(c); (R. at 15). However, in the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ came to this conclusion because there was no evidence that her severe limitations resulted in the requisite pulmonary insufficiency; impairment of gas exchange; pneumoconiosis; bronchiectasis; infections of the lungs; gastrointestinal hemorrhaging; chronic liver disease; weight loss; alteration of awareness; loss of consciousness; transient postictal manifestations of unconventional behavior; significant interference with activity during the day; or systemic manifestations affecting other body systems necessary to meet or equal Listings 3.00, 5.00, 11.00 or any other listing set forth in Appendix 1, Subpart P, Regulations No. 4.  (R. at 16). The ALJ further concluded that Plaintiff's mental impairments did not satisfy the criteria of listings 12.04 and 12.06. (R. at 16).

---

[24] Although Plaintiff alleged disability beginning March 1, 2000, the earliest month that a Plaintiff may receive payments is the month following the month in which the application was filed. 20 C.F.R. § 416.335. Therefore, the ALJ considered Plaintiff's disability as of April 15, 2009. (R. at 23).

As such, the ALJ concluded under the fourth step that Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 CFR § 416.967(a), except that she is limited to occasional balancing, stooping, crouching, and climbing ladders, ramps, and stairs; no climbing ropes or scaffolds; occasional kneeling and crawling; and must avoid exposure to fumes, odors, gases, chemicals, extreme heat or cold, and extreme wetness or humidity. (R. at 18). Further, Plaintiff would be limited to simple, routine, repetitive tasks, with no fast-paced production and involving no more than simple work-related decisions and no more than infrequent changes in work setting and may have only occasional interaction with coworkers, supervisors and the public. (R. at 18). Upon finding underlying physical or mental impairments that could have reasonably been expected to produce Plaintiff's pain, the ALJ evaluated the intensity, persistence and limiting effects of those symptoms and found that Plaintiff's subjective statements concerning these symptoms to not be credible to the extent they were inconsistent with the record. (R. at 19). Then, in the last step, the ALJ concluded that based upon Plaintiff's age, education, work experience and residual functional capacity, there was a significant number of jobs which she could perform. 20 C.F.R. §§ 416.969 and 416.969(a); (R. at 22).

Plaintiff contends that the ALJ's calculation of Plaintiff's Residual Functional Capacity is not supported by substantial evidence due to his failure to properly discuss pertinent and probative evidence.[25] Docket No. 9 at 12. Defendant responds in its Motion for Summary Judgment that the evidence of record fails to establish her inability to work and further argues that the ALJ's decision is supported by substantial evidence. (Docket No. 11 at 1). For the following reasons, the Court finds that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and will thus affirm the ALJ's opinion.

---

[25] Plaintiff does not present any argument that her mental impairments establish her disability. Therefore, the Court's discussion will only directly address evidence related to Plaintiff's physical impairments.

A.    *ALJ'S RESIDUAL FUNCTIONAL CAPACITY DETERMINATION*

Plaintiff first argues that the ALJ erred by failing to properly address the issue of her time off-task in the Residual Functional Capacity determination. (Docket No. 9). Specifically, Plaintiff submits that the ALJ ignored her testimony that she becomes incapacitated due to her pain for 10-45 minute periods that occur about six days a week and at least seven times per day. (Docket No. 9 at 14-15). She contends this testimony is supported by Dr. Scheler's medical records. *Id*. As such, Plaintiff alleges that an individual who is incapacitated for extended periods of time on a daily basis would be unsuitable for gainful employment and therefore, the ALJ's decision should be reversed. *Id*. at 15. The Court disagrees.

A claimant's residual functional capacity is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." 20 C.F.R. § 404.1525(a)(1); *see also Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir.2001) (quoting *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 121 (3d Cir.2000) (quotations omitted)). The Commissioner determines a claimant's residual functional capacity by performing a function-by-function assessment of a claimant's ability to do work related activities. *see* S.S.R. 96–8, 1996 WL 374184, at *1 (holding that, in determining a claimant's residual functional capacity, the Commissioner "must first identify the individual's functional limitations and restrictions and assess his or her work-related abilities on a function-by-function basis"); s*ee also* 20 C.F.R. §§ 404.1545, 416.945; *Salles v. Commissioner of Social Security*, 229 Fed. App'x. 140, 149 n.7 (3d Cir. 2007)). In making this assessment, the Commissioner must consider all impairments, including those determined to be non-severe. 20 C.F.R. § 404.1545(a)(2). The Commissioner must also consider all of the evidence of record in making a residual functional capacity determination. *Burnett*, 220 F.3d at 121 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir.

1999); *Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir.1986)). The evidence of record includes all medical records, as well as "observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli*, 247 F.3d at 41. "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett,* 220 F.3d at 121 (citations omitted).

In this Court's estimation, the ALJ's conclusion that Plaintiff was capable of performing sedentary work limited to simple, routine, repetitive tasks is supported by the evidence identified in the record. The ALJ considered and summarized Plaintiff's testimony at the hearing as well as her self-reported symptoms in the record. (R. at 19). The ALJ then provided a functional analysis while discussing how Plaintiff's alleged endometriosis-related limitations were contradicted by medical evidence and Plaintiff's own evidence regarding her activities of daily living. (R. at 19-20). This analysis was further supported by the ALJ's examination of the medical opinions contained in the record. (R. at 20-21). Further, Plaintiff has presented no medical evidence that establishes her alleged limitations. Therefore, based upon the following analysis, the Court finds that the ALJ's residual functional capacity assessment is supported by substantial evidence.

1. *PLAINTIFF'S TESTIMONY AND ALJ'S CREDIBILITY ASSESSMENT*

Plaintiff's initial challenge to the ALJ's residual functional capacity determination is that the ALJ improperly failed to discuss his rationale for rejecting Plaintiff's testimony describing her subjective complaints of pain. (Docket No. 11 at 15). "An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." *Mason v. Shalala,* 994 F.2d 1058, 1067 (3d Cir. 1993). If the ALJ determines that the complaints of pain are supported by medical evidence, the ALJ must

"determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Hartranft v. Apfel,* 181 F.3d 358, 362 (3d Cir. 1999). These complaints of pain will be given "great weight" if they are supported by the evidence of the record. *Mason,* 994 F.2d at 1067–1068. However, the ALJ may reject the plaintiff's subjective complaints so long as the ALJ specifies his reasons for rejecting the claim and supports the conclusion by identifying conflicting evidence in the record. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). Moreover, under the applicable regulations, the ALJ may consider Plaintiff's daily activities as a valid factor when determining the reliability of the claimant's subjective complaints. 20 C.F.R. § 404.1529(c)(3).

Plaintiff argues that the ALJ erred because he "rejecte[d] pertinent or probative evidence without explanation." *Johnson v. Commissioner of Social Security*, 529 F.3d 198, 203-204 (3d Cir. 2008). The Court finds that the ALJ sufficiently identified evidence in the record that supports his conclusion and provided an explanation as to why Plaintiff's testimony was rejected. (R. at 19). Initially, it is clear the ALJ did consider and partially credited Plaintiff's testimony by concluding that "[Plaintiff]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 19). The ALJ discussed these inconsistencies, while addressing the residual functional capacity determination, with supporting facts based upon Plaintiff's self-reported activities. (R. at 19). As a single mother, Plaintiff has been able to care for both of her children as well as their dog, (R. at 160); although it does appear she receives some help from the children's father and his family. (R. at 46). She can also care for herself, as records from treating and consulting sources consistently noted that Plaintiff displayed adequate appearance and hygiene. (R. at 235-253, 262, 344, 364). Further, Plaintiff is able to perform

routine household tasks, including preparing all three meals, cleaning, doing laundry and shopping. (R. at 161).

The ALJ's decision to partially credit Plaintiff's testimony is further supported by substantial medical evidence. (R. at 19). Plaintiff complains about the scarring in her lung, but she has only undergone one LEEP procedure to treat this impairment which occurred over five years prior to the hearing. (R. at 33). Plaintiff alleges most of her pain comes as a result of her endometriosis. (R. at 33). Although Plaintiff has required treatment for her physical impairments; there is no evidence which suggests any ongoing treatment other than medication, which has not been recently changed nor have the dosages been altered. Finally, no portion of the evidence, other than Plaintiff's own complaints, discusses Plaintiff suffering from pelvic pain so severe that it results in incapacitation, let alone the constant, daily dehabilitating pain described during her testimony.

Plaintiff further contends that she is incapable of completing tasks not just because of her pain, but also because she experiences difficulty in maintaining concentration. (R. at 45, 251). The ALJ recognized and included a moderate limitation in her residual functional capacity and supported his findings with substantial evidence in the record. (R. at 17). Despite Plaintiff's diagnosis with depression, insomnia and anxiety, she was consistently cooperative while displaying coherent thoughts and did not suffer from any disturbances while meeting with her physicians. (R. at 235-253, 262, 344, 364). She also responded appropriately to all of her questions at the hearing without any overt lapses in concentration. (R. at 20). As a result, Plaintiff is not limited to the extent she alleges, and is instead capable of performing simple, repetitive tasks without fast-paced production and involving no more than simple work-related decisions. (R. at 18).

For these reasons, the Court holds that the ALJ's explanation of his credibility determination provides substantial analysis as to support Plaintiff's RFC determination.

2. *RELIANCE ON PHYSICIANS' OPINIONS*

Plaintiff next contends that the ALJ erred by not giving Dr. Scheler's opinion greater weight, arguing that his treatment notes support her testimony that she is incapacitated on a regular, daily basis due predominately to her endometriosis-related pain. (Docket No. 9 at 15). It is well settled that "[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted). The opinions of a treating physician merit greater weight because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)). However, a treating physician's opinion will only be given controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Fargnoli*, 247 F.3d at 43 (alteration in original) (quoting 20 C.F.R. § 404.1527(d)(2)).

If the treating physician's opinion conflicts with that of a non-treating physician, "the ALJ may decide whom to credit but cannot reject evidence for no reason or for the wrong reason." *Morales,* 225 F.3d at 317. Although treating and examining physician opinions often

deserve more weight than the opinions of doctors who merely review records, *see, e.g.*, 20 C.F.R. § 404.1527(d)(1)-(2), "[t]he law is clear ... that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Brown v. Astrue*, 649 F.3d 193, 197 n. 2 (3d Cir. 2011). An ALJ may afford such an opinion less weight, "depending on the extent to which supporting explanations are provided." *Plummer,* 189 F.3d at 429 (citing *Newhouse v. Heckler,* 753 F.2d 283, 286)). Indeed, reports in which a physician only checks a box or fills in blanks should not be afforded the same weight as actual medical evidence unless accompanied by a written report. *Mason v. Shalala,* 994 F.2d 1058, 1065 (3d Cir.1993). State agency opinions merit significant consideration as well. *See* SSR 96–6p ("Because State agency medical and psychological consultants ... are experts in the Social Security disability programs, ... 20 C.F.R. §§ 404.1527(f) and 416.927(f) require [ALJs] ... to consider their findings of fact about the nature and severity of an individual's impairment(s)...."); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).

Prior to reviewing the opinions of each of Plaintiff's physicians, the ALJ noted that none of their opinions directly addressed Plaintiff's "physical ability to perform work-related activities." (R. at 20). The ALJ first analyzed the records and opinion of Plaintiff's primary care physician, Dr. Scheler, who had determined on a Pennsylvania Department of Welfare Form that Plaintiff was disabled due to her physical and mental impairments. (R. at 382). The Court agrees with the ALJ's decision to give Dr. Scheler's ultimate disability opinion little weight because even though he was Plaintiff's primary treating physician, his records do not contain sufficient medical evidence to conclude Plaintiff is disabled. *Fargnoli*, 247 F.3d at 43. Neither a function by function analysis nor a written report accompanying the disability determination was included in Dr. Scheler's records. *See Mason,* 994 F.2d at 1055 ("Form reports in which a physician's

obligation is only to check a box or fill in a blank are weak evidence at best"). As such, the record does not suggest evidence of frequent and debilitating pain. Rather, the records reveal that Dr. Scheler prescribed Vicodan, Motrin, and Bentyl to address her symptoms. (R. at 261).[26] Plaintiff testified that Dr. Scheler told her nothing could be done with respect to her pain or bleeding, (R. at 43), but this statement is not corroborated by Dr. Scheler's own records and the Court has already agreed with the ALJ's conclusion that Plaintiff's testimony is only partially credible. Critically, Dr. Scheler's medical assessment form asserting Plaintiff's disability did not give any explanation as to how Plaintiff's impairments caused her alleged inability to work. (R. at 382). Thus, substantial evidence supports the ALJ's decision to give Plaintiff's primary treating physician's report little weight.

On the other hand, Dr. Fox's opinion of Plaintiff's physical condition was supported by substantial evidence. Accordingly, the ALJ properly gave more weight to Dr. Fox's opinion than the unsupported opinion of Dr. Scheler. (R. at 21). Although Plaintiff suffered from erosive gastritis and inflammatory bowel disease, Dr. Fox correctly noted that she had yet to receive treatment for either. (R. at 360). Based upon Plaintiff's statements regarding her symptoms and their effects, the treatment she received, and her responses to treatment, Dr. Fox determined that Plaintiff's statements were only partially credible. (R. at 361). His report was given some weight, as his findings were consistent with the rest of the record. (R. at 21). Yet, the ALJ also pointed out that Dr. Fox underrepresented certain of Plaintiff's limitations based on the evidence, which is why his report was not given greater weight. (R. at 21). Nevertheless, Dr. Fox is a state agency

---

[26] Other possible courses of treatment for endometriosis include treatment of hormone medications to prevent the endometriosis from worsening or surgery to remove the areas of endometriosis or the entire uterus and ovaries. *See PubMed Health*, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001913/(last viewed on Mar. 18, 2013).

physician and ultimately, the ALJ found his findings were supported by sufficient evidence of record. *Chandler,* 667 F.3d at 361.

The opinion by Dr. Kennedy was also given some weight by the ALJ and his specific findings were given greater weight because they were consistent with the record. (R. at 21). Dr. Kennedy had observed that Plaintiff portrayed sufficient concentration and memory during their session, although she alleged difficulty in maintaining focus. (R. at 347). The rest of Dr. Kennedy's specific findings were very similar with that of Dr. Heil, a non-examining psychologist, whose opinion was also given some weight. (R. at 21). Neither physician found that Plaintiff was markedly limited in any aspect of their abilities, (R. at 351, 362-363), but Dr. Heil found that Plaintiff was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 363).

The Court agrees with the ALJ's conclusion that Dr. Scheler's opinion was not only inconsistent with those of the other physicians involved, but it was also inconsistent with the entirety of the record. It is the ALJ's duty to weigh the evidence and resolve conflicts between medical sources, providing adequate support in the record for each conclusion. *See Morales,* 225 F.3d at 317. The ALJ satisfied his duty in this case. Therefore, the ALJ's residual functional capacity determination has been supported by substantial evidence.

B.     *ALJ'S CONSIDERATION OF THE HYPOTHETICAL QUESTIONS*

Plaintiff advances a final argument that the ALJ did not properly address or consider the vocational expert's answer to the hypothetical question whereby a person who requires two additional, unscheduled 10-15 minute work breaks during the course of a day would be unemployable. (Docket No. 9 at 14). For the ALJ to consider a vocational expert's answer to a

hypothetical question as substantial evidence, it must accurately include all of the claimant's physical and mental impairments. *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002) (citing *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)). However, "[s]imply because a hypothetical was posed, does not mean that there was sufficient evidence to support it; the ALJ ultimately relies upon only credible, medically established limitations." *Menuto v. Astrue*, 2012 WL 2594339, at *9 (W.D. Pa. June 13, 2012) (citing *Rutherford v. Barnhart,* 399 F.3d 546, 554 (3d Cir. 2005)). "Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response." *Burns,* 312 F.3d at 12. If the limitation is medically supported but also contradicted by other evidence in the record, the ALJ may determine whether the evidence is credible, but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir. 1993); 20 C.F.R. § 416.929(c)(4).

The Court has already determined that the ALJ's residual functional capacity determination was supported by substantial evidence. Additionally, the record contains no evidence aside from Plaintiff's testimony, which the ALJ properly rejected, that supports Plaintiff's contention that she requires an inordinate amount of breaks, rendering her disabled. Therefore, the hypothetical question and answer relied upon by the ALJ which indicated Plaintiff was suitable for employment accurately included all of the claimant's physical and mental impairments. *Burns*, 312 F.3d at 123. *See Johnson v. Comm'r of Soc. Sec.*, 398 F. App'x 727, 736 (3d Cir. 2010) (holding that a hypothetical question which included the need to take constant breaks was irrelevant where the ALJ's residual functional capacity assessment did not include this limitation); *Fletcher v. Massanari,* 2002 WL 32348331 (E.D. Pa. Mar. 14, 2002) (holding that ALJ's reliance on hypothetical which did not include the need for constant breaks was not

erroneous where only proof of Plaintiff's physical limitation was her own testimony). Accordingly, the ALJ did not err by refusing to adopt the suggested limitations because they were not supported by appropriate medical evidence.

In all, the Court finds that the ALJ's decision to not explicitly include the claimed limitation in the Residual Functional Capacity analysis was supported by substantial evidence.

## VI.    CONCLUSION

Based upon the foregoing, the decision of the ALJ is supported by substantial evidence in the record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment (Docket No. 8) is denied, Defendant's Motion for Summary Judgment (Docket No. 10) is granted, and the decision of the ALJ is affirmed. Appropriate Orders follow.

_s/ Nora Barry Fischer_
Nora Barry Fisher
United States District Judge

Dated: March 20, 2013

cc/ecf: All counsel of record.